Dear Representative Pettigrew
¶ 0 This office has received your request for an official Attorney General Opinion in which you ask, in effect, the following question:
In November 2001, the City of Oklahoma City will present toits voters a limited term sales tax, the proceeds to be used onpublic school facilities within the city's corporate limits,pursuant to the Oklahoma Municipal Utility Revenue Bond Act, 11O.S. Supp. 2000, §§ 22-150[11-22-150] through 22-159. The proposalapportions those tax proceeds, giving 70% to the Oklahoma CitySchool District and 30% to other school districts which haveschools within the municipal boundary. Is such an apportionmentconstitutional?
 I. Introduction
¶ 1 Your question centers around Oklahoma City Ordinance No. 21,805, scheduled to be voted on by the voters of Oklahoma City ("City") at an election on November 13, 2001. If approved by the voters, the sales tax code (Oklahoma City, Okla., Sales Tax Code ch. 52, art. II (1999)) would be amended by the adoption of Section 52-23.2. Oklahoma City, Okla., Ordinance 21,805, § 1. This tax would levy an additional limited-term excise tax upon certain gross proceeds or gross receipts, the proceeds from which would go into a limited-purpose trust fund to be known as the "Oklahoma City Metropolitan Area Public Schools Sales Tax Fund."Id. § 1(d). The trustees of this fund would be appointed by the City and the Oklahoma City Independent School District ("I-89"). Oklahoma City Metropolitan Area Public Schools Trust, art. VI(1) (2001) (photocopy on file in the Attorney General's Office); seealso 60 O.S. Supp. 2000, § 176.1[60-176.1](B)(1). Monies from this trust fund would provide or improve public schools or public school facilities owned by I-89 and 23 other school districts[1]
located either in whole or in part within the corporate limits of the City attended by City-resident students,[2] or would allow for the demolition of certain abandoned school facilities located within the City limits. Oklahoma City Metropolitan Area Public Schools Trust, art. III (photocopy on file in Attorney General's Office).
¶ 2 As noted in your question, the tax would be allocated among the various school districts which have facilities within the City municipal boundaries. Through Resolutions approving a Memorandum of Understanding between the City and the various school districts, 70 percent of the fund would go to I-89, and the remaining 30 percent would be split among the other 23 school districts having school buildings or facilities within the City corporate limits. See Resolution Approving a Memorandum ofUnderstanding Among the City of Oklahoma City, The Oklahoma CityMetropolitan Area Public Schools Trust, and Certain Named PublicSchool Districts, Summary of Key Terms: Memorandum ofUnderstanding Among City/OCMAPS Trust/Certain Named Public SchoolDistricts, II. Allocation of Funds, § 3.A (2001) (photocopy on file with Attorney General's Office); Resolution Approving aMemorandum of Understanding Among the City of Oklahoma City, TheOklahoma City Metropolitan Area Public Schools Trust, andIndependent School District No. 89 of Oklahoma County, Oklahoma,Memorandum of Understanding Among City/OCMAPS Trust/I-89 SchoolDistrict, II. Key Terms, § 3.B (2001) (photocopy on file with Attorney General's Office). You ask whether the division of funds in this manner is constitutional.
 II. Analysis
¶ 3 Your concern centers around an Equal Protection question: whether such an apportionment treats all City inhabitants in a manner that is constitutionally acceptable.
A. Presumption of Constitutionality.
¶ 4 In general, when reviewing the constitutionality of a legislative enactment, it is important to remember a legislative act is presumed to be constitutional and will be upheld unless it is "clearly, palpably and plainly inconsistent with the Constitution." Reherman v. Okla. Water Res. Bd.,679 P.2d 1296, 1300 (Okla. 1984). A city may act legislatively "whenever and wherever its interest is properly concerned, and its legislative judgment of the necessity of action is final and conclusive, subject only to reasonableness under a rule of law which may be judicially applied to its enactments, or orders, or ordinances, and the enforcement of them." City of Bethany v.Dist. Court, 191 P.2d 187, 189 (Okla. 1948).
¶ 5 When reviewing a municipal enactment, the reviewing body,
 [M]ust determine the character of the ordinance from its provisions, and if it clearly appears therefrom that its primary purpose is the raising of revenue it must be treated as a tax, and if its primary purpose is regulation it must be treated as enacted under the police power. When no police inspection, supervision, or regulation is provided, nor any standard set for the applicant to establish, or that he agrees to attain or maintain, but any and all persons engaged in the business designated, without qualification or hindrance, may come, and a license on payment of the stipulated sum will issue, to do business, subject to no prescribed rule of conduct and under no guardian eye, but according to the unrestrained judgment or fancy of the applicant and licensee, the presumption is strong that the power of taxation, and not the police power, is being exercised.
Ex parte Davis, 114 P.2d 186, 189 (Okla.Crim. 1941) (citation omitted). It is within the power of a municipality to levy a tax. With this conclusion established, the remaining point to be considered is "whether the tax in question is discriminatory and illegal." Id. at 190.
B. Public Purpose.
¶ 6 Although you do not directly raise it, a review of proper uses for taxpayer dollars is appropriate before beginning the Equal Protection analysis.
¶ 7 The Oklahoma Supreme Court has recently reiterated the deference given to municipalities in their ability to raise revenue in the form of taxation:
 The City Council is the legislative body of a city. As such, it is its function to determine what expenditures are designed to promote the public good and welfare of the city and its inhabitants. It has no limitations as to expenditures," save and except those which are expressly placed on its exercise by the Constitution of the State."
 The term "public purpose" should not be construed "in a narrow or restrictive sense." Courts are to give great deference to a legislative body's determination that a particular project will serve a public purpose. In reviewing that determination, "courts cannot interfere to arrest legislative action where the line of distinction between that allowable and that which is not is faint and shadowy." Such a determination should be reversed only upon a clear showing that it was manifestly arbitrary, capricious, or unreasonable.
 The structure of economic development arrangements must change and grow over time to reflect and respond to increased commercial competition and complexities. An economic development plan, in whatever form it takes, will be upheld so long as it serves a public purpose and otherwise meets constitutional requirements.
State ex rel. Brown v. City of Warr Acres, 946 P.2d 1140,1144-45 (Okla. 1997) (citations omitted). In examining the particular tax at issue in Brown (appellants had instituted an action in the nature of qui tam challenging the constitutionality of the city's economic development plan under which the city provided financial incentives to induce a property owner to enter into a long term lease with a retailer), the Court continued:
 By passage of Resolution 214, the Warr Acres City Council determined that the proposed economic development plan would promote a legitimate public purpose by increasing sales tax revenues for the City of Warr Acres, adding new jobs, retaining existing jobs, and promoting collateral economic growth and development. The essential question presented to this Court, as well as to the trial court, is not whether the details of the plan match those in Burkhardt,
[Burkhardt v. City of Enid, 771 P.2d 608 (1989)] but rather whether the plan served a legitimate public purpose. It is not for the courts to second guess the wisdom of the City Council in agreeing to the details of the plan. This Court need not agree that it was the best arrangement or even a good arrangement. If the economic development plan served a legitimate public purpose of promoting the general welfare, economic security, and prosperity of the City of Warr Acres and its citizens, then it withstands constitutional challenge.
Id. at 1145.
¶ 8 Here, the Legislature enacted 11 O.S. Supp. 2000, §22-159[11-22-159][3] as part of the Oklahoma Municipal Utility Revenue Bond Act. Section 22-159 allows a municipality to support any public school system located either in whole or in part within a municipality's corporate limits by providing revenues for construction or improvement of public school facilities.[4] In response to that, Oklahoma City has enacted an ordinance for a vote of its inhabitants. Oklahoma City, Okla., Ordinance 21,805. There can be no question that availability of adequate public schools is an important right(see Okla. Const. art. I, § 5; Okla. Const. art. XIII, §1)[5] or that the expenditure of public funds for education is a "public purpose." See also Burkhardt v. City of Enid,771 P.2d 608 (Okla. 1989) (holding imposition of a tax to acquire a private university's campus, and to lease the campus back to the university for a sum below market rate, did not violate the state Constitution as authorizing the expenditure of public funds other than for a "public purpose"). Accordingly, such a tax withstands a constitutional challenge that it would not be for a public purpose.
C. Standard of Review under Equal Protection Analysis.
¶ 9 In conducting an Equal Protection analysis, the standard of review varies according to the right or class involved. The most exacting standard is referred to as "strict scrutiny," which is used when "the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." St. Paul Fire Marine Ins.Co. v. Getty Oil Co., 782 P.2d 915, 920 (Okla. 1989) (quotingMass. Bd. of Ret. v. Murgia, 427 U.S. 307, 312 (1976)). The most lenient is the rational basis standard, used in situations where no such fundamental right or suspect classification exists.Id. at 921. The question to be answered under that standard is "whether the statute is rationally related to a legitimate government interest." Id. (citing Fair Sch. Fin. Counsel v.State, 746 P.2d 1135, 1144 (Okla. 1987)).
D. Analysis under Federal Constitution.
¶ 10 Under federal constitutional analysis, funding of public schools is "an inappropriate candidate" for strict judicial scrutiny. San Antonio Indep. Sch. Dist. v. Rodriguez,411 U.S. 1, 44 (1973). Rather, the appropriate standard of review is whether the action "rationally furthers a legitimate state purpose or interest." Id. at 55 (citation omitted). The basis for this holding was that education is not a right afforded explicit protection under the federal Constitution. Id. at 35. Therefore, under Section 1 of the Fourteenth Amendment to the Constitution of the United States, the proper standard to be used is the so-called "rational basis" test.
E. Analysis under State Constitution.[6]
¶ 11 The Oklahoma Supreme Court has held that "[t]he same equal protection component found in the fourteenth amendment of the United States Constitution is present in the due process clause of art. 2, § 7." Presley v. Bd. of County Comm'rs,981 P.2d 309, 312 (Okla. 1999).
¶ 12 Unlike the federal Constitution, provisions for a free public education are made in the Constitution of the State of Oklahoma. Okla. Const. art. I, § 5[7] establishes a system of public schools in the state; and Okla. Const. art. XIII, §1[8] mandates that the Legislature establish the system. Despite its being mentioned in the Constitution, the Oklahoma Supreme Court has declined to use a strict scrutiny standard of review.
¶ 13 In Fair School Finance Council of Oklahoma, Inc. v.State, 746 P.2d 1135, 1148 (Okla. 1987), plaintiffs contended that education was a fundamental interest based on provisions mentioning public education in the state Constitution; therefore, strict judicial scrutiny must be applied. The Court disagreed.
 Nor is equal educational opportunity — in the sense of equal expenditures per pupil — guaranteed by the express terms of our state constitution. Article 1 § 5 states that "[p]rovisions shall be made for the establishment and maintenance of a system of public schools, which shall be open to all children of the state. . . ." Article 13 § 1 provides that "[t]he Legislature shall establish and maintain a system of free public schools wherein all children of the State may be educated." These sections merely mandate actions by the Legislature to establish and maintain a system of free public schools. They do not on their face guarantee equal expenditures per pupil.
Id. at 1149. However, continued the Court, even assuming that education is a fundamental interest, the question was what was the exact nature of the interest guaranteed. After reviewing previous cases concerning the method of school funding, the Court recited that a school system "should provide our youth with `such degree of learning that when the work is done they may be educated young men and women' and with `such mental and moral training as will make them useful citizens of our great commonwealth.'" Id. (quoting Miller v. Childers,238 P. 204, 206 (1924)). The Court then concluded that the right guaranteed in the State Constitution "is a basic, adequate education according to the standards that may be established by the State Board of Education." Id. Based on this examination of the State Constitution, the Court held there was no authority to support a contention that the method of funding a school district should be subjected to strict scrutiny. Id. at 1150. Accordingly, the Court used a rational basis test to examine the question presented. Id.
F. The Rational Basis Test.
¶ 14 Because neither a fundamental right nor a suspect classification is implicated here, the rational basis test is applied. See Ross v. Peters, 846 P.2d 1107, 1115 (Okla. 1993).
¶ 15 The rational basis standard of review is a "paradigm of judicial restraint." FCC v. Beach Communications, Inc.,508 U.S. 307, 314 (1993).
 The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.
Id. (quoting Vance v. Bradley, 440 U.S. 93, 97 (1979)). This same philosophy was expressed in Oklahoma County UtilityServices Authority v. Corporation Commission, 519 P.2d 919,921 (Okla. 1974):
 [C]ourts do not concern themselves as to whether an act of the Legislature is wholesome and salutary in its operation or whether such legislation is unwise and harmful. The judiciary can interfere with legislative action only when it clearly appears that a given act contravenes the basic law of the State and for that reason is unconstitutional and void.
Id. (citing Haas v. Holloman, 327 P.2d 655, 658 (Okla. 1958)).
¶ 16 It is possible a rational relationship exists for allocating the Oklahoma City School District 70 percent of the money raised by the tax, while dividing the remaining 30 percent among the other 23 school districts. The most obvious reason is that, while other districts may overlap into the City corporate limits and may have some students who are City-resident students, "nearly all (if not all) I-89 public schools and public school facilities are attended by City-resident students[.]" ResolutionApproving a Memorandum of Understanding Among the City ofOklahoma City, The Oklahoma City Metropolitan Area Public SchoolsTrust, and Independent School District No. 89 of Oklahoma County,Oklahoma, at 3, para. 4 (2001) (photocopy on file in Attorney General's Office).
¶ 17 "Where a legitimate state purpose is achieved via a statutory means that does not violate the relatively relaxed standard of minimal rationality, the classification scheme passes constitutional muster." Ross, 846 P.2d at 1117. See alsoCiticorp Sav. Trust Co. v. Banking Bd., 704 P.2d 490, 497
(Okla. 1985) (If there is a conceivable rational basis for difference in treatment, the statute is valid.).
¶ 18 From the above discussion, it can be seen that since a legitimate purpose of educating the City's children exists and that rationale does not violate the "relaxed" standard of review under the rational basis test, the allocation is constitutional. Further, to examine evidence which might tend to rebut the presumption of constitutionality, Reherman, 679 P.2d at 1300, would involve questions of fact which are beyond the scope of an Attorney General Opinion. 74 O.S. Supp. 2000, § 18b[74-18b](A)(5). Accordingly, the method by which the fund is apportioned satisfies the Equal Protection requirements of the United States and Oklahoma Constitutions.
¶ 19 It is, therefore, the official Opinion of the AttorneyGeneral that:
 If passed by the voters of Oklahoma City, an apportionment oftax proceeds through a trust fund which would allocate 70% to theOklahoma City School District (I-89) and 30% to 23 other schooldistricts, which benefits all school districts located either inwhole or in part within the corporate limits of Oklahoma City,pursuant to the Oklahoma Municipal Utility Revenue Bond Act (11O.S. Supp. 2000, §§ 22-150[11-22-150] through 22-159), does not violatethe Equal Protection clauses of either the United States orOklahoma Constitutions.
W.A. DREW EDMONDSON ATTORNEY GENERAL OF OKLAHOMA
DAN CONNALLY ASSISTANT ATTORNEY GENERAL
[1] The other public school districts are Robin Hill, Oakdale, Banner, Crutcho, Putnam City, McLoud, Moore, Luther, Choctaw-Nicoma Park, Deer Creek, Harrah, Jones, Edmond, Piedmont, Yukon, Norman, Millwood, Western Heights, Midwest City-Del City, Crooked Oak, Union City, Mustang and Little Axe. ResolutionApproving a Memorandum of Understanding Among the City ofOklahoma City, The Oklahoma City Metropolitan Area Public SchoolsTrust, and Certain Named Public School Districts, Exhibit A (2001) (photocopy on file with Attorney General's Office).
[2] The term "City-resident student" is defined in the ordinance. There are a number of variables, but the term can be defined essentially as a student with an Oklahoma City address who is officially enrolled in a public school district which is located either in whole or in part within the corporate limits of the City. Oklahoma City, Okla., Ordinance 21,805, § 1, Section 52-23.2(f)(1)(a).
[3] Section 22-159 of Title 11 reads:
 Municipalities may support any public school system located in whole or in part within the corporate limits of the municipality, including without limitation by the expenditure of municipal revenues for construction or improvement of public school facilities. In furtherance of municipal support for any public school system, as authorized by this section, the municipal governing body may take all actions necessary to effectuate such support.
Id.
[4] The Attorney General has previously discussed Section 22-159 at length and has determined its constitutionality. See
A.G. Opin. 00-59 at 307-08.
[5] These provisions are discussed in more detail below.
[6] Okla. Const. art II, § 7 reads:
 No person shall be deprived of life, liberty, or property, without due process of law.
Id.
[7] That provision reads:
 Provisions shall be made for the establishment and maintenance of a system of public schools, which shall be open to all the children of the state and free from sectarian control; and said schools shall always be conducted in English: Provided, that nothing herein shall preclude the teaching of other languages in said public schools.
Okla. Const. art. I, § 5.
[8] That provision states:
 The Legislature shall establish and maintain a system of free public schools wherein all the children of the State may be educated.
Okla. Const. art. XIII, § 1.